The Chancellor.
The bill is filed to enforce the execution of a trust. The complainant’s case, as made by the bill, is this. That he is the executor of the will of James Howell, deceased; that, in September, 1814, his testator recovered a judgment against the defendant, Henry Howell; that, in June, 1828, James and Henry Howell, who were brothers, had a settlement together of their accounts, upon which settlement it was acknowledged that there was then due on the judgment the sum of $700; that, to secure this debt, Henry Howell agreed to convey to Walter Kirkpatrick a lot in the town of Paterson, in trust for the benefit of the said James Howell, until an advantageous sale thereof could be made; and that from the proceeds of such sale the said James Howell should be, in the first place, paid his debt of $700, and interest from the time of the settlement, and that the balance, if any should remain after such payment, and the payment of the expenses incident to the discharge of the said trust, should be paid by the said Walter Kirkpatrick to the said Henry Howell; that, in pursuance of the said agreement, Henry Howell and his wife, on the 19th day of July, 1828, executed and delivered to Walter Kirkpatrick their deed for the said lot of land; that the trust *351 has never been executed, and that the said sum of $700 and interest is still due and owing; that, in 1838, James Howell died, leaving the complainant the executor of his will, which lias been duly proved, and letters testamentary issued; that, in 1841, Walter Kirkpatrick died intestate, leaving only one child, a daughter, his heir at law, to whom the legal title in the trust estate descended. The bill is filed against Ellen E. Kirkpatrick, the widow of Walter Kirkpatrick, alleging that she sets up a claim of dower in the land, and against Susan E. Kirkpatrick, the heir at law of Walter, Hugh Kirkpatrick, the administrator of Walter, and Henry Howell.
Henry Howell is the only defendant who has answered the bill. There is no difficulty with the other defendants. The heir at law of Walter Kirkpatrick makes no claim to the property, except as trustee holding the legal estate by descent from her father.
Henry Howell, by his answer, denies the trust set up in the bill, lie admits that his brother had a judgment against him; but alleges that, at the time of the execution of the deed to Walter Kirkpatrick, the judgment was paid in full. He denies that there was any such settlement between himself and brother, as stated in the bill, or that he owed him anything at the date of the alleged settlement, lie says, that he gave his brother possession of the lot in 1820, and that his brother paid himself what was due on the judgment out of the rents and profits, and then fraudulently gave up the possession to one Daniel Martin, who made a claim to it under an alleged sale for taxes ; that he, the defendant, conveyed the lot to Walter Kirkpatrick, that he, Walter, might bring suit, and recover the possession for him, and that this mode was adopted because he was a poor man, and he supposed that the suit could be more advantageously conducted by and in the name of Walter Kirkpatrick. He claims that the property is held in trust for him, and alleges that his brother never had any interest in the trust.
*352 No attempt whatever was made to prove the allegations contained in this answer. Some excuse was attempted to be made, on the argument, for the failure to produce evidence in support of the answer, by attributing the failure to the neglect of counsel, who had been relied upon to conduct the cause on behalf of the. defendant. But the answer, in every material matter, is contradicted by positive testimony, and by every fact and circumstance connected with the transaction. The settlement — the acknowledgment that there was, at that time, due the sum of seven hundred dollars — and the agreement of Henry Howell to convey the property to "Walter Kirkpatrick in trust to pay that debt — are proved beyond all doubt.
If the case rested here, the court could not enforce this trust, because such a trust cannot be proved by parol; nor would the peculiar position which the parties occupy in this suit justify the court in permitting the trust to be established by such evidence. It is true that the party who holds the legal title, upon which this trust is sought to be imposed, does not make any objection to the mode of proof. The trustee is in default in not appearing to the suit, and submits to the discretion of the court. But where a bill is filed to establish and enforce a trust, although the alleged trustee does not appear to oppose the claim, the court will order proofs to be taken to establish the case made by the bill. And the evidence to prove the trust must be legal: thus, where a trust is alleged which, from its very character, is required by the statute to be in writing, the court will not permit parol to be substituted for the written evidence which the statute requires.
But the complainant insists that he has proved the trust by competent evidence. The deed from Henry Howell and wife to "Walter Kirkpatrick bears date the 19th of July, 1828. It is absolute on its face, and purports to be for the consideration of three hundred dollars. •Some time in the year 1839,1840, or 1841, (the time is not fixed with greater precision by the witness) "Walter Kirk *353 patrick drew up, and delivered to the complainant, at his solicitation, the following writing:
“About June 22d, 1828, W. E. was requested to meet E. P. S. at the house of James Howell, in Troy, for the purpose of aiding James Howell and Henry Howell (then at his brother James Howell’s) in effecting a settlement between the brothers. James Howell then had a claim, by judgment I think in the Essex Pleas, against his brother Henry, and, as I understood had been urging payment. Henry alleged that James had had the leasing and control of a house and lot in Paterson, belonging to Henry, and had received, or ought to have received rents, by which his judgment claim ought to be reduced below the amount James claimed — W. E. does not recollect that he took any part in the preliminaries to the settlement which was that day effected — and he thinks that E. E. S. and perhaps A.-H. S. were principally active, and took part with the said James and Henry H. in urging about the settlement. But ~W. E. well remembers that the final result of all the deliberations and conversations between the parties and their friends was a final settlement between the said Henry and James of all matters between them and that said Henry acknowledged his indebtedness at that time to the said James, in the sum of §700.00; that the said James agreed to stay further proceedings on his judgment. Provided Henry and his wife would convey the Paterson house and lot to W. II. in implied trust; that the same should be sold by said W. II. as soon as in the judgment of the said "W. E. and said James it could be done to the best advantage, the said James to have his debt aforesaid first paid out of the proceeds, and the balance after paying expenses, to be paid to the said Henry. All this was agreed to — "W. E. was then requested to make out a deed from Henry Howell and his wife to said W. E. — the deed to be a warranty deed the usual form without expressing the trust — Such deed for such House & lot was accordingly drawn by W. E. dated June 30th, *354 1828, and sent to H. Howell to have executed. — W. 3L afterwards received it duly executed and acknowledged by H. H. and wife, the date having been altered from June 20, 1828 to July 19, 1828, which alteration is duly noted before signing & sealing — and is recorded in the Essex County Clerk’s office, in Lib. Z. 2 of Heeds, fols 180, 181.” — This paper is not subscribed by Walter Kirkpatrick. I have given it in the words and punctuations as it is offered in evidence.
This is good, and binding in law and equity as a declaration of trust, although it is not subscribed by the person declaring the trust. The statute does not require the writing to be subscribed, but to be signed by the party who is by law enabled to declare the trust. Wherever the name may appear in the writing — whether subscribed at the end or signed, that is, placed as the sign of authentication in the body of the instrument itself for the purpose of attesting it — such is a signing of the writing, and is a substantial compliance with the statute. The weight of authority is with this construction.
The case of Bawdes v. Amhurst (Prec. in Ch. 403, case 274,) was this, as it is given in the syllabus as reported. On a marriage treaty, the intended husband and the young lady’s father went to a counsellor’s chambers, to have, in consideration of the portion the father proposed to give, a settlement drawn. Minutes of the agreement were taken down in writing by the counsel, and given by him to his clerk, to be drawn up in form; the next day the father died, and the day following the marriage was solemnized. This agreement, notwithstanding these preparations, was held to be within the statute of frauds.
It is very manifest that a court would not be justified in giving efficacy to such an agreement, and for the simple reason, that the very explanation, as to the existence of the paper, shows that the parties did not intend it to be a binding agreement. The writing merely contained the proposals for an agreement, which was subsequently to be *355 put into a writing, which was to constitute the agreement between the parties. It is true the language, which Lord Cowper is reported to have used, would seem to imply that he considered that the statute could only be complied with by subscribing the writing. The report says, “ my Lord Chancellor said, he had been always tender in laying open that wise and just provision the parliament had made; that the act had not only directed such agreements to he in writing, as if that alone were sufficient, hut went further, and directed them to ho signed by the parties themselves, or some other lawfully authorized by them for that purpose; that to obviate the pretence of such and such eases being out of the mischief of the statute, the parliament had in general words comprehended all, and directed all agreements should he in writing, and signed by the party; that he knew no case where an agreement, though it were all written with the party’s own hand, had been held sufficient, unless it had likewise been signed by the party.” And he further said, “that the party’s not signing it was an evidence that he'did not think it complete.” But afterwards he is reported to have said, “that unless it were either signed by the party, or something equivalent done to show that he looked upon it as completed and perfected, he thought such writing by the party himself was not sufficient to bind him within the statute.” It was not necessary, in the case, to decide whether subscription at the end of the writing was the only signing authorized by the statute; and when the Lord Chancellor said, that something equivalent to such signing might be done, he qualified what he is reported to have said previously in the case.
In Hawkins v. Holmes (1 P. Wms. 770), Lord Hardwick did not decide that the name must bo subscribed at the end of the writing, nor did he intimate what, in his opinion, would constitute a signing. He said, “ the party’s signing the agreement is absolutely necessary.” That is true; hut the question remains — what constitutes a signing in con *356 templation of the statute ? All that was decided in Hawkins v. Holmes was, that where an agreement had been prepared, by an attorney of both parties, for the sale of a house, and the purchaser, in his own hand, made several alterations in the draught of the agreement, such writing would not bind him.
In Welford v. Beazely (3 Atk. 503), the Lord Chancellor said — where the statute had been complied with in the material part, the forms had never been insisted upon. He denied the general doctrine, as laid down in Prec. in Chan. 402, Bawdes v. Amhurst, though true as applied to that case by Lord Cowper ; and said, that the writing there, though all in the father’s hand, was only a sketch of an agreement.
This question was considered in Stockes v. Moore et ux., 1 Cox 219. The bill was filed to compel the defendants to renew a lease. The writing was in these words: “ The lease renewed — Mr. Stockes to pay the king’s tax, also to pay Moore ¿£24 a year, half-yearly. Mr. Stockes to keep the house in good tenantable repair.” The question was— whether there was a sufficient signature by Moore to take the case out of the statute ? It was agreed that it did not matter in what part of the instrument the name was to be found, and the point was, whether it was there for the purpose of giving authenticity to the instrument.
In Fonter v. Hale (3 Ves. Jr. 696), the most important piece of evidence was a writing, not signed by the party, but in his handwriting; and it was received by the court.
In Ogilvie v. Foljambe (3 Merr. 53), it was decreed that the agreement should be specifically performed, although the name appeared only in the body of the instrument. The Master of the Rolls says — “ another question is, whether, taking the agreement to be sufficiently explicit in terms, it has the signature which is required by the statute. It is admitted that, provided the name be inserted in such manner as to have the effect of authenticating the instrument, the provision of the act is complied with, and *357 it does not much signify in what part of the instrument the name is to be found.” The ease of Sebby v. Sebby (3 Merr. 2) does not controvert this principle.
If the defendant himself writes the agreement for the purchase of a leasehold house, and states his own name in the third person, as “ Mr. A. 33. has agreed,” this is a good contract within the statute of frauds, though he does not otherwise sign the agreement. Propert v. Parker, 1 Russell & Mylne 625. J. B. Bridges, being seized in fee of an undivided moiety of five hundred houses in Cable street, Liverpool, agreed to sell it to the plaintiff, and thereupon Bridges drew up the following memorandum in his own handwriting: “July 26th, 1839. — John Blakely agrees with J. B. Bridges to take the property in Cable street for the net sum of ¿6248 10s.” The Vice Chancellor was of opinion that the agreement was sufficiently signed to take it out of the statute of frauds, and decreed accordingly. Blakely v. Smith, 11 Simon 150.
From a review of all the authorities, I think it may be considered as settled, that it is not required, by the letter or spirit of the statute, that the signature of the party should be subscribed to a declaration of trust; but that it is sufficient, if the writing is authenticated by the party as his writing, for the purpose of declaring the trust. Is this writing so authenticated ?
The name of Walter Kirkpatrick at length does not appear in the writing. It is represented, or signified, by his initials several times in the body of the instrument. Those initials are used by him as his signature. The terms of the trust are explicit. His object is apparent, and admits of no doubt. The paper was evidently intended by him as a declaration of trust, and was made for the benefit of the cestuis que trust. Parol evidence is necessarily admissible to establish the execution of the instrument. The writing itself is clear and unequivocal. Walter Kirkpatrick was called upon for the purpose of ascertaining from him the terms upon which he held the property. In *358 the presence of the witness, he committed those terms to writing, and then delivered the writing to the witness as the evidence of the trust for the benefit of the parties entitled to it. The trustee does not now question the writing or deny the trust. I think the writing is legal evidence of the trust, and satisfies the requirements of the statute.
But this writing is objected to, on the ground that it was not made until more than ten years after the alleged trust was created. The statute does not require that the trust shall be created by a writing, but that it shall be manifested and proved by wilting. This trust was created on the 19th of July, 1828, when the deed was executed to Walter Kirkpatrick; but to manifest and prove this trust a writing was necessary, that is, the cestui que trust could not establish the trust by parol. He must prove it by written evidence. When this written evidence was made — whether it was coeval with the trust, or was executed afterwards, cannot affect the trust. A question of fraud, that is, whether the trust was really created at the time of the execution of the instrument, or deed, to which the manifestation of the trust refers, is always an open question. Suppose a judgment, or some other lien, had attached to the property in the interval between the execution of the deed and the declaration of trust, it would have been necessary, in order to defeat such lien, to show that the trust was bona fide created at the time of the execution of the deed. This, however, might he done by parol; because the statute does not require that the trust should be created, but only manifested in writing. “ It is, on the strength of this peculiarity in the wording of the statute, that letters and other written documents, though long posterior in date to the transaction itself, have been admitted in courts of justice to have an operation equivalent to that of a formal and coeval declaration of trust.” Roberts on Frauds 101. It was this principle— that a declaration of trust might have a retroactive effect, and refer back to the time when the trust was created— *359 that was decided by Lord Cowper, in Ambrose v. Ambrose (1 P. Wms. 321), and prevented the custom of London from interposing, and giving to the widow the interest of the trust fund as personal estate. There is no fraud in this case. There are no intervening liens, unless there is something in the next objection, which I shall state, taken by Henry Howell.
He insists that there was an implied trust, or a trust created by operation of law, in his favor. He says that this was a voluntary conveyance, made by him to Walter Kirkpatrick; that no consideration passed between them —and that, therefore, the grantee became a naked trustee for the benefit of the grantor. In the first place, how is this implied trust proved ? The deed is absolute upon the face of it. It purports to have been made for the consideration of $300, the receipt of which is acknowledged by the grantor. The grantor cannot destroy the operation of that deed, by proving that it was voluntary, and instead of conveying an absolute, conveyed only a trust estate. For certain purposes, the grantor may question the consideration mentioned in the deed. He may prove that it was not paid-for the purpose of recovering the consideration money, but he cannot, by parol, turn an absolute into a qualified or trust estate. Roberts on Frauds 101; Story’s Eq. § 1201, note 2; Brown v. Bell, 20 J. C. R. 338; Bullard v. Briggs, 7 Pick. 537. But if he could prove by parol that the deed was voluntary, and thereby establish an impled trust, the equity which arises upon a rule of presumption may be rebutted by parol evidence. The implied trust may be repelled by the same kind of evidence by which it is established. Roberts on Frauds 101; Story, § 1202, note 1. The parol evidence in this case does not establish the fact, that this was a voluntary deed, but on the contrary, that the consideration was a debt due from the grantor to a third person, and that the conveyance was made for the purpose of discharging the debt. All the evidence in the case — the declaration of trust and *360 the testimony of the witnesses who were cognizant of the whole transaction — rebut every presumption of an implied trust.
Again, Henry Howell insists that there has been such laches, on the part of James Howell, and those claiming under him, as should induce the court to declare the judgment'debt satisfied, and the property discharged from, the trust. It is insisted that this property, having been conveyed upon the trust that it should be sold to pay the debt — as it was to be sold, by the trustee, with the concurrence of James Howell — that having kept the property under their control for more than twenty years without executing the trust, they should be punished for such gross laches, and be cut off from all benefit in the property. In the first place, it does not appear that any one has been prejudiced by this delay, or that the property could have been advantageously disposed of, or that Henry Howell would have been any way benefited if the property had been earlier sold. In the second place, Henry Howell is chargeable with the' same laches that he imputes to his brother. Henry could have compelled the trustee to execute the trust as well as his brother; and the evidence shows that no one of the individuals interested in the trust acquiesced more quietly in the delay than Henry Howell himself.
Again, it is said the court should presume the judgment satisfied after such a lapse of time. But there can be no such presumption in this case. The trust was created for the purpose of paying this judgment, and the trust has never been executed. All presumption of payment is rebutted by the facts and circumstances of the ease. It was also insisted that no interest should be allowed on account of the laches in executing the trust. It ■was as much the duty and intei'est of Henry Howell to see this trust executed as it was of James Howell, and one is as much chargeable with laches as the other. There is nothing in the case to show the propriety of mulcting *361 the cestui que trust in damages, hy depriving him of his interest in the trust fund. It does not appear, as I have already stated, that the property could have heen earlier disposed of to advantage, or that it has yielded any profits, or that, by any diligence, it could have been made profitable. It does not appear who has had the possession of the property since the trust was created. Besides this, Henry Howell, who now asks that the trustee and cestui que trust should be punished for not executing the trust, is the only one who has thrown any obstacles in the way of its execution. He contests this suit on the ground that no such trust was ever created, and insists upon it that it ought not now to be executed. How can the court, under such circumstances, punish the trustee, or the representative of James Howell, because the trust has not been earlier executed ?
Again, there is some excuse for this delay. The trust was created in 1828. It was not contemplated that the property should be immediately sold. It was to prevent the judgment being pressed, and the property from being then sold, that the deed was executed. In 1888, James Howell died. It appears that the executor exerted himself, at once, to have the trust carried out. Then, in a few years, "Walter Kirkpatrick died, and the legal estate descended to an infant. The next step was the commencement of this suit, which has been contested, at every point, by Henry Howell.
The trust has been established by legal evidence, and there are no facts or circumstances, in my judgment, to impair it. I shall order a reference to a master to ascertain what is due on the judgment, and the amount, if anything, to which the trustee is entitled for executing the trust. Upon coming in of the report, Henry Howell will be at liberty to redeem the property, by paying the amounts ascertained to be due. If he declines to redeem, the property will be sold for the purpose of discharging the trust.